IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CATHOLIC CHARITIES OF THE ARCHDIOCESE OF PHILADELPHIA, et al. | : : : : | CIVIL ACTION |
| Plaintiffs, v. | : : : : | NO. 14-3096 |
| SYLVIA BURWELL, in her official capacity as Secretary of the Department of Health and Human Services, et al. | : : : : : | |
| Defendants. | : | |

**MEMORANDUM**

BUCKWALTER, S. J.                                                                                                                                                            June 26, 2014

Pending before the Court are Plaintiffs Catholic Charities of the Archdiocese of Philadelphia, St. John's Orphan Asylum, St. Edmond's Home for Crippled Children, Don Guanella Village of the Archdiocese of Philadelphia, Divine Providence Village, The Philadelphia Protectory for Boys, Catholic Community Services, Inc., Nutritional Development Services, Inc., Catholic Health Care Services Supportive Independent Living, St. Monica Manor, St. John Neumann Nursing Home, Immaculate Mary Home, St. Francis Country House, St. Martha Nursing Home, St. Mary Manor, St. John Vianney Center, Catholic Clinical Consultants, and the Roman Catholic Archdiocese of Philadelphia (collectively "the Archdiocese" or "Plaintiffs")'s Motion for a Preliminary Injunction. For the following reasons, Plaintiffs' Motion for a Preliminary Injunction is denied.

**I.     BACKGROUND**

    **A.     The Parties**

Plaintiff Roman Catholic Archdiocese of Philadelphia is a territory of the Roman

Catholic Church constituting the counties of Philadelphia, Bucks, Chester, Delaware, and Montgomery in Pennsylvania. (Pls.' Mot. for Prelim. Inj., Decl. of Joseph A. Sweeney, Jr. (Sweeney Decl.) ¶¶ 11–12.) Catholic Human Services of the Roman Catholic Archdiocese of Philadelphia is an organization overseeing the operations of the remaining Plaintiffs. (Id. ¶¶ 5,7.) Defendants Sylvia Burwell,[1] Thomas Perez, and Jacob Lew (collectively "the Government" or "Defendants") are the Secretaries of the U.S. Departments of Health and Human Services ("HHS"), Labor, and Treasury, respectively.

### B. Plaintiffs' Religious Beliefs and Self-Insured Health Care Plan

Plaintiffs' mission is to "proclaim to everyone the Good News that Jesus Christ is the Light of the world, who offers to all who follow Him the light of life." (Id. ¶ 13.) Plaintiffs' programs are "driven by, and grounded in, Catholic teaching[.]" (Id. ¶ 9.) "The [Roman Catholic] Church teaches that life begins at the moment of conception, sexual union should be reserved to committed marital relationships in which husband and wife are open to the transmission of life, and, therefore, artificial interference with life and conception are contrary to core beliefs." (Id. ¶ 146.) As such, "[t]he Church opposes directly or indirectly providing or facilitating the use of contraceptive services" or "associat[ing] in any way with the provision of contraceptive services." (Id. ¶¶ 147, 153.)

Plaintiffs provide health insurance to more than 4,000 employees through a self-insured plan, with Independence Blue Cross serving as its third-party administrator. (Id. ¶ 6, 139.) Plaintiffs' self-insured health care plan is a "church plan," exempted from the requirements of the

---

[1] At the time Plaintiffs initiated the present case, Kathleen Sebelius was Secretary of Health and Human Services. This case caption has been amended to substitute Sylvia Burwell as the current Secretary of Health and Human Services.

2

Employee Retirement Income Security Act of 1974 ("ERISA") under 29 U.S.C. § 1003(b)(2). (Id. ¶ 138.) Plaintiffs' plan "does not offer coverage for contraceptives, with the exception of prescription and use of contraceptive medications for non-contraceptive, medical purposes." (Id. ¶ 142.) Plaintiffs' current health care plan began on July 1, 2013, and will expire on June 30, 2014. (Id. ¶ 135.)

## C. Contraceptive Coverage Requirement Under the ACA and the Exemption for Eligible Religious Organizations

### 1. Contraceptive Coverage Requirement

On January 1, 2014, many provisions of the Patient Protection and Affordable Care Act ("ACA") went into effect. Among the new rules was a requirement that group health plans for organizations with at least fifty full-time employees provide coverage, without cost-sharing, for "such additional preventative care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration ["HRSA"]" including "the full range of [Food and Drug Administration]-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity."[2] 26 U.S.C. § 4980H(c)(2); 42 U.S.C. § 300gg–13(a)(4); Inst. of Med. Clinical Preventative Servs. for

---

[2] Defendants represent that "[b]ecause there were no existing HRSA guidelines relating to preventative care, HHS requested that the Institute of Medicine ["IOM"] develop recommendations to implement the requirement to provide coverage, without cost-sharing, for preventative services for women. . . . On August 1, 2011, HRSA adopted guidelines consistent with IOM's recommendations, subject to an exemption relating to certain religious employers authorized by regulations issued that same day" and adopted the guidelines into final rules on February 12, 2012. (Defs.' Resp. Opp'n Mot. for Prelim. Inj. 6); see also 77 Fed. Reg. 8725, 8726–27. Plaintiffs do not dispute Defendants' account of the rulemaking process.

3

Women: Closing the Gaps, 10–12 (2011).[3]  This is the so-called "contraceptive mandate." Certain group health plans were exempted from this requirement under a "grandfathering" provision.[4]  42 U.S.C. § 18011; 45 C.F.R. § 147.140; 29 C.F.R. § 2590.715-1251; 26 C.F.R. § 54.9815-1251T.

### 2. Rights and Responsibilities of Eligible Religious Organizations and EBSA Form 700

Religious organizations with more than fifty employees may exempt themselves from the group health plan contraceptive coverage requirements if they meet the following criteria:

> (1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under [45] § 147.130(a)(1)(iv)[5] on account of religious objections.
>
> (2) The organization is organized and operates as a nonprofit entity.
>
> (3) The organization holds itself out as a religious organization.
>
> (4) The organization self-certifies . . . and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies. The self-certification must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of the Employee Retirement Income Security Act of 1974.

---

[3] As of the date of this Memorandum Opinion and Order, the Supreme Court has not yet issued a decision in its review of the United States Court of Appeals for Third Circuit in Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dept. of Health and Human Servs.,724 F.3d 377 (3d Cir. 2013), cert. granted, 134 S.Ct. 678 (2013), as consolidated with its review of Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114 (10th Cir. 2013).

[4] Plaintiffs' group health plan was not "grandfathered."  (Compl. ¶ 55.)

[5] "With respect to women . . . evidence-informed preventive care and screenings provided for in binding comprehensive health plan coverage guidelines supported by the Health Resources and Services Administration."  45 C.F.R. § 147.130(a)(1)(iv).

45 C.F.R. § 147.131(b).

To self-certify as an "eligible organization," an organization executes and delivers to its health care plan administrator Employee Benefits Security Administration ("EBSA") Form 700. (Compl., Ex. A, EBSA Form 700.) In completing and signing EBSA Form 700, an organization's signing official certifies that "on account of religious objections, the organization opposes providing coverage for some or all of any contraceptive services that would otherwise be required to be covered; the organization is organized and operates as a nonprofit entity; and the organization holds itself out as a religious organization." (Id.) The form provides further notice specifically to "Third Party Administrators of Self-Insured Health Plans" that the self-insuring eligible organization "[w]ill not act as the plan administrator or claims administrator with respect to claims for contraceptive services, or contribute to the funding of contraceptive services" and that the completed certification "is an instrument under which the plan is operated." (Id.)

Should an otherwise non-exempt organization fail to either self-certify as an eligible religious organization or comply with the ACA's contraceptive coverage requirements, the organization is subject to a tax equal to "$100 for each day in the noncompliance period with respect to each individual to whom such failure relates." 26 U.S.C. § 4980D(b)(1), (e)(1). Plaintiffs estimate that the amount of the potential tax it would have to pay for noncompliance would be $160,000 per day. (Sweeney Decl. ¶ 145.)

### 3. Rights and Responsibilities of Third-Party Administrators

A third-party administrator may not charge a self-certified eligible religious organization any premiums, fees, or other charges, directly or indirectly, with respect to contraceptives. 29 C.F.R. § 2590.715-2713A(b)(2). If a third-party administrator pays for and provides

5

contraceptives to the participants and beneficiaries of the eligible organization's group health plan, the third-party administrator may seek reimbursement for the "total dollar amount of the payments for contraceptive services" plus "an allowance for administrative costs and margin . . . no less than 10 percent of the total dollar amount of the payments for contraceptive services." 29 C.F.R.§ 2590.715-2713A(d); 45 C.F.R. § 156.50(d)(2–3).

### D. Procedural History

Plaintiffs initiated the present litigation on June 2, 2014. Plaintiffs bring three counts against Defendants: (1) a violation of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1; (2) a violation of the Free Exercise Clause of the First Amendment to the U.S. Constitution; and (3) a violation of the Freedom of Speech Clause of the First Amendment to the U.S. Constitution. On the same day they filed their Complaint, Plaintiffs moved for a preliminary injunction, seeking an order enjoining Defendants from "requir[ing] Plaintiffs to provide contraceptive coverage," "requir[ing] Plaintiffs to sign EBSA Form 700," "in any way requir[ing] Plaintffs to authorize or facilitate the provision of contraceptive coverage to their employees," or assessing "any fine, penalty, or tax . . . for failing to execute and deliver EBSA Form 700[.]" On June 17, 2014, Defendants filed their Response in Opposition. On June 20, 2014, the Plaintiffs filed their Reply. This Court heard oral argument on the Motion on June 24, 2014, making it ripe for review.

## II. DISCUSSION

Plaintiffs seek a preliminary injunction pursuant to Federal Rule of Civil Procedure 65. Fed. R. Civ. P. 65. To be entitled to a preliminary injunction, a movant must show "(1) a likelihood of success on the merits; (2) he or she will suffer irreparable harm if the injunction is

denied; (3) granting relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief." Bimbo Bakeries USA, Inc. v. Botticella, 613 F.3d 102, 109 (3d Cir. 2010) (quoting Miller v. Mitchell, 598 F.3d 139, 147 (3d Cir. 2009)). "A plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate." NutraSweet Co. v. Vit-Mar Enters., Inc., 176 F.3d 151, 153 (3d Cir. 1999) (citing Optician's Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 192 (3d Cir. 1990)). The Court begins its analysis by assessing the likelihood of Plaintiffs' success on the merits of their claims.

### A. RFRA Claim

Count One of the Complaint alleges a violation of the RFRA. Under the RFRA, the Government may not "substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb–1(a) and (b). A "substantial burden" exists where the Government compels a plaintiff "to perform acts undeniably at odds with fundamental tenets of their religious beliefs." Wisc. v. Yoder, 406 U.S. 205, 218 (1972). A "substantial burden" also exists where the Government "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs[.]" Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S. 707, 717–18 (1981).

#### 1. Plaintiffs' Standing

As a preliminary matter, the Court has some doubt as to whether Plaintiffs have standing to bring an RFRA challenge to the contraceptive mandate because the contraceptive mandate might not be enforceable against Plaintiffs or their third-party administrator in the first place. It

7

is undisputed that Plaintiffs offer their employees health insurance through a self-insured "church plan." A "church plan" is explicitly exempt from the requirements of ERISA. 29 U.S.C. § 1003(b)(2). At least one court has found that:

> It is ERISA that accords the government authority to penalize any third-party administrator that undertakes to pay for the coverage by remaining in its contractual relationship with the self-certifying organization but then fails to make the necessary payments or arrangements. See 29 C.F.R. § 2510.3–16(b). . . . The church plan plaintiffs have not alleged an injury in fact that will flow from filing the self-certification form because that form has no effect other than to relieve their burden to provide contraceptive services coverage. Therefore, the church plan plaintiffs lack standing to bring the RFRA claim[.]

Roman Catholic Archbishop of Washington v. Sebelius, ___ F. Supp. 2d ___, No. Civ.A. 13-1441, 2013 WL 6729515, *24, *26 (D.D.C. Dec. 20, 2013). Indeed, 29 C.F.R. § 2510.3–16(b) states that an eligible religious organization's self-certification "shall be treated as a designation of the third-party administrator as the plan administrator *under section 3(16) of ERISA* for any contraceptive services required to be covered under § 2590.715–2713(a)(1)(iv) of this chapter to which the eligible organization objects on religious grounds, and shall supersede any earlier designation." Id. (emphasis added). Moreover, 29 C.F.R. § 2510.3–16(b) sets forth a third-party administrator's responsibilities "as incorporated into section 715 of ERISA." Id.

It is unclear whether, as the Roman Catholic Archbishop of Washington court found, this rule is unenforceable in the case of an ERISA-exempt "church plan," or if the words "shall supersede any earlier designation" removes the exemption of a "church plan" from ERISA for purposes of the provision of contraceptive services. At this juncture, the Court need not, and

8

does not, decide the issue of Plaintiffs' standing to bring their claims. The uncertainty of Plaintiffs' standing, however, decreases the likelihood of success on the merits of their claims.

### 2. Substance of Plaintiffs' RFRA Claim

Assuming for purposes of the pending motion only that Plaintiffs have standing to bring the present action, the Court addresses the substance of Plaintiffs' RFRA claim. "[P]laintiffs bear the initial burden under the RFRA of establishing 'that application of the offensive law or policy would substantially burden a sincere, religious exercise.'" Geneva Coll. v. Sebelius, 929 F. Supp. 2d 402, 427 (W.D. Pa. 2013) ("Geneva Coll. I") (citing Conestoga Wood Specialties Corp. v. Sebelius, 917 F. Supp. 2d 394, 410 (E.D. Pa. 2013)), aff'd 724 F.3d 377 (3d Cir. 2013), cert. granted, 134 S. Ct. 678 (2013)); see also Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal, 546 U.S. 418, 429 (2006) (holding that a plaintiff meets its prima facie burden under RFRA where a Government action would "(1) substantially burden (2) a sincere (3) religious belief").

Defendants do not contest the sincerity of Plaintiffs' religious beliefs. Even so, Plaintiffs still cannot show likelihood of success on the merits of their RFRA claim because they have not met their burden to make a prima facie showing of a substantial burden. Plaintiffs argue that it is a substantial burden for them to execute and deliver EBSA Form 700 to Independence Blue Cross, their third-party plan administrator, because doing so would "create a vital link in a chain toward the provision of contraceptive services." (Pls.' Mem. Supp. Mot. for Prelim. Inj., 19.)[6]

---

[6] While it is correct that "'[c]ourts should not undertake to dissect religious beliefs' when analyzing substantial burden questions," Geneva College v. Sebelius, 941 F. Supp. 2d 672, 682 (2013) ("Geneva College II") (quoting Thomas, 450 U.S. at 715), it is entirely within the courts' purview to analyze whether a burden on a sincere, religious belief is substantial. "If every plaintiff were permitted to unilaterally determine that a law burdened their religious beliefs, and

9

Yet, EBSA Form 700 does not have the legal effect that Plaintiffs assert it has. Instead, EBSA Form 700 only provides notice to Plaintiffs' third-party administrator that Plaintiffs "oppos[e] providing coverage for some or all of any contraceptive services that would otherwise be required to be covered" and therefore "[w]ill not act as the plan administrator or claims administrator with respect to claims for contraceptive services, or contribute to the funding of contraceptive services." (EBSA Form 700.) For two reasons in particular, EBSA Form 700 is not the "vital link" to contraceptives coverage.

First, in light of the uncertainty about ERISA's applicability to a "church plan" in this case, the provision of contraceptives by a third-party administrator to a "church plan" might be purely voluntary. As Plaintiffs assert and the Government concedes, "ERISA enforcement authority is not available with respect to the [third-party administrators] of self-insured church plans under the regulations, and the government cannot compel such [third-party administrators] to provide contraceptive coverage to self-insured church plan participants and beneficiaries, including the employees of plaintiffs and their covered defendants." (Defs.' Proposed Findings of Fact and Conclusions of Law ¶ 23 (citing 29 U.S.C. § 1003(b)(2), and 78 Fed. Reg. 8456 (Feb. 6, 2013).)[7] If the parties are correct, this would lessen any burden on Plaintiffs' free exercise of

---

courts were required to assume that such burden was substantial, simply because the plaintiff claimed that it was the case, then the standard expressed by Congress under the RFRA would convert to an 'any burden' standard." Conestoga, 917 F. Supp. 2d at 413–14 (citing Washington v. Klem, 497 F.3d 272, 279–81 (3d Cir. 2007)).

[7] Given that 29 C.F.R. § 2510.3–16(b) says that the submission of EBSA Form 700 "shall be treated as a designation of the third-party administrator as the plan administrator under section 3(16) of ERISA for any contraceptive services" and that such designation "shall supersede any earlier designation," the Court is not certain that this is correct. See supra (II)(A)(1).

10

religion, as there would be no enforcement mechanism by which the Government could mandate that Independence Blue Cross provide contraceptive services to the participants and beneficiaries in Plaintiffs' plan.

Plaintiffs argue that because third-party administrators to eligible religious organizations may seek reimbursement from the Government for a "total dollar amount of the payments for contraceptive services" plus "an allowance for administrative costs and margin . . . no less than 10 percent of the total dollar amount of the payments for contraceptive services," 29 C.F.R. § 2590.715-2713A(d); 45 C.F.R. § 156.50(d)(2–3), the Government is applying "substantial pressure on the Archdiocese Affiliates to violate their sincerely held religious beliefs" because the Government is "initiating incentives for the third party administrator to provide the objectionable services." (Pls.' Mem. Supp. Mot. for Prelim. Inj. 20, 22.) There is no evidence in the record to support Plaintiffs' speculation that Independence Blue Cross will provide contraceptive services to the participants and beneficiaries of Plaintiffs' self-insured plan simply because doing so would make Independence Blue Cross eligible to receive a Government benefit. It is equally conceivable that Independence Blue Cross would conclude that it is in its overall economic interest to forego the Government benefit and continue to adhere to the wishes of its client. Moreover, it is well established that, pursuant to the Spending Clause of Article I, Section 8 of the Constitution, Congress may "further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." S.D. v. Dole, 483 U.S. 203, 206 (1987) (quotation omitted).

Second, assuming—again for purposes of the pending motion only— that ERISA does apply to Plaintiffs' "church plan" for purposes of the coverage of contraceptives, the "vital link

toward the provision of contraceptives" is still not EBSA Form 700. Rather, the "vital link" would be federal law, enacted by Congress and promulgated through regulations by the U.S. Departments of Health and Human Services, Labor, and Treasury. While the Third Circuit has yet to rule on the issue,[8] two other circuit courts have concluded that the contraceptive mandate and the accommodation for eligible religious organizations do not impose a "substantial burden." See Univ. of Notre Dame v. Sebelius, 743 F.3d 547, 556 (7th Cir. 2014) and Mich. Catholic Conference and Catholic Family Servs. v. Burwell, ___ F.3d ___, Nos. Civ.A. 13-2723; 13-6640, 2014 WL 2596753, at *12 (6th Cir. June 11, 2014). In both University of Notre Dame and Michigan Catholic Conference, the plaintiffs characterized the execution and delivery of EBSA Form 700 to their third-party administrators as a "trigger" to contraceptive coverage for their plan participants and beneficiaries. Univ. of Notre Dame, 743 F.3d at 554; Mich. Catholic Conference, 2014 WL 2596753 at *6. Presented with this argument in Michigan Catholic Conference, the Sixth Circuit opined as follows:

> Submitting the self-certification form to the insurance issuer or third-party administrator does not "trigger" contraceptive coverage; it is federal law that requires the insurance issuer or the third-party administrator to provide this coverage. The ACA requires "[a] group health plan and a health insurance issuer offering group or individual health insurance coverage" to "provide coverage for . . . with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration." 42 U.S.C. §§ 300gg–13(a), (a)(4). Thus, under the ACA, the appellants' health plans and insurance issuers must provide contraceptive coverage without cost-sharing, whether or not the appellants decide to self-certify.

---

[8] As of the date of this Memorandum Opinion and Order, the Third Circuit has not yet held oral argument on the Government's pending appeal of the grant of a preliminary injunction in the consolidated cases of Zubik v. Sebelius and Persico v. Sebelius, ___ F. Supp. 2d ___, Nos. Civ.A. 13-1459, 13-0303, 2014 WL 6118696 (W.D. Pa. Nov. 21, 2013).

> "Federal law, not the religious organization's signing and mailing the form, requires health-care insurers, along with third-party administrators of self-insured health plans, to cover contraceptive services." Univ. of Notre Dame, 743 F.3d at 554. . . . The obligation to cover contraception will not be triggered by the act of self-certification— it already was triggered by the enactment of the ACA.

Mich. Catholic Conference, 2014 WL 2596753, at *9. This Court agrees with the Sixth Circuit's analysis that "it is federal law that requires the insurance issuer or the third-party administrator to provide this coverage" and therefore "[t]he obligation to cover contraception will not be triggered by the act of self-certification[.]" Id.

Given the doubt regarding Plaintiffs' standing and the limited notice effect of EBSA Form 700, Plaintiffs have not met their burden to make a prima facie showing of a substantial burden on their exercise of religion. In the absence of such a showing from Plaintiffs, the Court need not reach the issues of the Government's compelling government interest or whether any Government interest is being achieved through the least restrictive means. The Court cannot find a likelihood of success on the merits as to Plaintiffs' claim under the RFRA. Accordingly, the Court must deny Plaintiffs' Motion as to its RFRA claim.

## B. Free Exercise Claim

Count Two of the Complaint alleges that Defendants have violated Plaintiffs' rights under the Free Exercise Clause of the First Amendment to the U.S. Constitution. The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. Const. amend I. A law that is neutral and generally applicable is subject to rational basis review and does not violate the Free Exercise Clause even where that law has the practical effect of burdening a particular religious exercise. Emp't Div.,

13

Dep't of Human Res. of Or. v. Smith, 494 U.S. 872, 879 (1990), (recognized as partially superseded on other grounds, Sossamon v. Texas, ___ U.S. ___, 131 S. Ct. 1651 (Apr. 20, 2013)). "Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 521 (1993). A law is neutral if it does not "target religious conduct for distinctive treatment" either on its face or as applied in practice and it is generally applicable if it does not "impose burdens only on conduct motivated by religious belief[.]" Id. at 533–34, 543–44.

As to the neutrality of the contraceptive mandate and the religious organization accommodation, it is apparent from the text of the statute and regulations, as well as the recommendations of the Institute of Medicine that informed the regulations, that "the purpose of the [regulations] is not to target religion, but instead to promote public health and gender equality." Conestoga, 917 F. Supp. 2d at 410. "[N]either the text nor the history of the statute of the statute and the regulations promulgated pursuant to the statute demonstrate that the requirement was targeted at a particular religious practice," and, as such, "[t]he contraceptive-coverage requirement is a neutral law." Mich. Catholic Conference, 2014 WL 2596753, at *15.

As to general applicability, Plaintiffs argue that because there are secular exemptions to the contraceptive mandate, including the "grandfathering" provision and the exemption for organizations with fewer than fifty employees, "any claim of general applicability by the Government is 'dubious, at best.'" (Pls.' Mem Supp. Mot. for Prelim. Inj. 29 (quoting Geneva Coll. I, 929 F. Supp. 2d at 437.) Yet, "[s]pecific exemptions to a law that are equally available to the adherents of a religious belief do not affect the law's general applicability." Roman Catholic

14

Archdiocese of Atlanta v. Sebelius, No. Civ.A. 12-3489, 2014 WL 1256373, at *24 (N.D. Ga. Mar. 26, 2014).[9] Here, the Government's interest in requiring coverage of contraceptive services "is pursued uniformly against all businesses that are not grandfathered and have more than fifty employees." Mich. Catholic Conference, 2014 WL 2596753, at *16. In other words, regardless of whether an organization is exempt from the contraceptive mandate because it has fewer than fifty full-time employees, because its health plan was "grandfathered," or because it is an eligible organization with a religious opposition to contraceptives, the exemptions to the contraceptive mandate are equally available to religious and secular organizations. As the Government made secular and religious exemptions equally available, it is clear that the contraceptive mandate is "generally applicable."

Because the contraceptive mandate is neutral and generally applicable, it is subject to rational basis review. The contraceptive mandate is rationally related to the Government's legitimate interest in advancing public health and gender equality. Accordingly, the Court cannot find that Plaintiffs have met their burden to show a likelihood of success on the merits of their free exercise claim and the Court will deny injunctive relief as to that count of their Complaint.

### C. Freedom of Speech Claim

Count Three of the Complaint alleges that Defendants violated Plaintiffs' rights under the Freedom of Speech Clause of the First Amendment. The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend I. Plaintiffs allege that the religious organization accommodation to the contraceptive mandate violates their free

---

[9] Notably, the Roman Catholic Archdiocese of Atlanta court granted an injunction as to the plaintiffs' challenge to the contraceptive mandate under the RFRA, but denied relief as to the plaintiffs' free exercise claim. Id. at *33.

speech rights. (Compl. ¶ 123.) In the case of the contraceptive mandate, however, "[t]he regulations do not require the accommodated entity to 'provide' contraceptive counseling," nor do the regulations "compel the [Plaintiffs'] speech by forcing them to pay for contraceptive counseling," and "the requirements do not force the [accommodated entity] to facilitate access to contraceptive counseling." Mich. Catholic Conference, 2014 WL 2596753 at *6, *12–13. In any event, "[i]t is not clear what speech, exactly, [Plaintiffs] believe is compelled by the facilitation of such coverage." Id. at *13.

As to EBSA Form 700, the execution and delivery of the form does not "trigger" contraceptive coverage, nor does it "deprive [Plaintiffs] of the freedom to speak out about abortion and contraception on their own terms." Id. While the Government may not compel speech where "an individual is obliged personally to express a message he disagrees with," Johanns v. Livestock Mktg. Ass'n, 544 U.S. 550, 557 (2005), if the Government has compelled any speech here, it is only compelling Plaintiffs to make a statement with which they agree, i.e., that they oppose coverage for contraceptives. Plaintiffs have not shown a likelihood of success on the merits of their freedom of speech claim, and the Court will deny Plaintiffs' Motion as to that count of its Complaint.

## III. CONCLUSION

Plaintiffs have not shown a likelihood of success as to any of their claims and have therefore not met their burden to show that they are entitled to injunctive relief. Accordingly, the Court will deny Plaintiffs' Motion for a Preliminary Injunction on the entirety of their Complaint.

An appropriate order follows.